1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANDREW R. LOPEZ,

11              Plaintiff,              No. CIV S-03-1605 GEB DAD P

12        vs.

13   S. COOK, et al.,

14              Defendants.            FINDINGS & RECOMMENDATIONS

15   _____/

16              Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to

17   42 U.S.C. § 1983.  Before the court is a wide-ranging motion for summary judgment filed on

18   behalf of  defendants Adams, Babich, Bartos, Cook, Garate, Gilliam, Harrison, Holmes, Johnson,

19   McClure, McKean, Martinez, Morton, Nergenah, Shaver, Statti and Vanderville.[1]  Plaintiff has

20   filed an opposition to the motion.  Defendants have not filed a reply.

21   /////

22   _____

23        [1]  The undersigned notes that the motion is wide-ranging because it sets forth eleven
     grounds upon which defendants contend they are entitled to summary judgment in their favor.
24   However, the motion does not address the legal standards governing motions for summary
     judgment.  Nor do the very brief arguments presented by counsel in support of each of the eleven
25   grounds advanced make reference to how summary judgment standards apply to the undisputed
     facts in this case.  The court feels that it cannot address the arguments in the same abbreviated
26   fashion counsel has presented them.  On the other hand, plaintiff's voluminous, and often
     irrelevant and repetitive, submissions are equally unhelpful in resolving the pending motion.

                                          1

1

**BACKGROUND**

2          The operative pleading in this action is plaintiff's third amended complaint filed

3   on October 6, 2004.  Therein, plaintiff set forth twenty-one causes of action and named twenty-

4   two defendants.  Five of those defendants have already been dismissed from this action.[2]  Six of

5   the causes of action set out in plaintiff's third amended complaint have also been dismissed.  In

6   this regard, pursuant to the court's order filed December 7, 2005, plaintiff's third, fourth,

7   seventh, eleventh, thirteenth and twenty-first causes of action were dismissed in their entirety.

8   That same order dismissed plaintiff's Fourteenth Amendment claim set forth in his eighth, ninth

9   and tenth causes of action.

10          The incidents giving rise to this action took place while plaintiff was incarcerated

11  at High Desert State Prison (HDSP).  The claims presented in plaintiff's third amended

12  complaint can be broadly categorized as involving allegations of retaliation, errors in the gang

13  validation process, conspiracy and state law violations.  The undersigned has previously

14  summarized those claims as follows:

15              Plaintiff's remaining substantive claims are the following.  First,
            plaintiff claims that he was retaliated against for filing a civil rights
16          lawsuit in 1994, submitting administrative grievances while
            imprisoned and engaging in jailhouse lawyering activities.
17          Plaintiff contends that in retaliation for his engaging in this
            protected conduct, prison officials placed him in administrative
18          segregation, validated him as a gang associate and placed him in a
            security housing unit (S.H.U.), denied him access to documents
19          needed to challenge his confinement in administrative segregation,
            lost or denied his inmate appeals, coerced other inmates to
20          fabricate evidence for use in validating plaintiff as a gang associate

21  /////

22  /////

23  /////

24  _____

25      [2]  Defendants Woodford and Drew were dismissed by order filed December 7, 2005.  See
    also Findings and Recommendations filed November 4, 2005.  The claims against defendants
26  Farris, Singletary and Hansen were dismissed without prejudice by amended order filed on
    March 14, 2007.  See also Findings and Recommendations filed on November 14, 2006.

and threatened plaintiff's safety.[3]  Second, plaintiff alleges that the gang validation determination in his case was unsupported, the evidence relied upon was fabricated and based on false statements, he did not receive administrative review of the determination, was denied both an opportunity to present his views and the evidence needed to defend himself and was denied meaningful classification reviews all in violation of his right to due process.  Third, plaintiff alleges that defendants have conspired to deprive him of his constitutional rights.  In this regard, plaintiff contends that because of engaging in protected conduct, he was placed in administrative segregation on February 2, 2000, under the "false pretext" that there was pending [an] investigation of his gang affiliation.  (Third Am. Compl. ¶ 49 at 3.)  Plaintiff alleges this was done so that defendants could conspire to fabricate evidence against him.  (Id.)  Fourth, plaintiff alleges that defendants violated the California Constitution by placing and retaining him in administrative segregation, failing to provide him due process and equal protection and by suspending his "habeas corpus guarantees[.]"  (Third Am. Compl., ¶¶ 127-132 at 17.)

(Findings and Recommendations (F&R) filed January 9, 2008, at 2-3.)

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

---

[3]  Plaintiff also contends that in retaliation for engaging in protected conduct, his legal property was stolen and the theft was covered-up by Correctional Officer Singletary who allegedly signed a false affidavit contending that plaintiff had received all of his property.  However, as noted above, officer Singletary has been dismissed from this action.  For this reason, the court will not address any claim of retaliation brought by plaintiff against Officer Singletary.

1   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

2   after adequate time for discovery and upon motion, against a party who fails to make a showing

3   sufficient to establish the existence of an element essential to that party's case, and on which that

4   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

5   concerning an essential element of the nonmoving party's case necessarily renders all other facts

6   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

7   whatever is before the district court demonstrates that the standard for entry of summary

8   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

9           If the moving party meets its initial responsibility, the burden then shifts to the

10  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

11  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

12  establish the existence of this factual dispute, the opposing party may not rely upon the

13  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

14  form of affidavits, and/or admissible discovery material, in support of its contention that the

15  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

16  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

17  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

18  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

19  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

20  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

21  1436 (9th Cir. 1987).

22          In the endeavor to establish the existence of a factual dispute, the opposing party

23  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

24  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

25  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

26  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

1  genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

2  committee's note on 1963 amendments).

3  　　　　In resolving the summary judgment motion, the court examines the pleadings,

4  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5  any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. <u>See</u> <u>Anderson</u>,

6  477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

7  court must be drawn in favor of the opposing party. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.

8  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

9  produce a factual predicate from which the inference may be drawn. <u>See</u> <u>Richards v. Nielsen</u>

10 <u>Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir.

11 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12 show that there is some metaphysical doubt as to the material facts . . . . Where the record taken

13 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

15 　　　　**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[4]

16 　　　　Defendants have moved for summary judgment in their favor with respect to all of

17 plaintiff's remaining causes of action. Below the court will address each of those causes of

18 action in the groupings defendants have addressed them in their motion.

19 I. <u>Retaliation Claims (First, Second, Eighth and Ninth Causes of Action)</u>

20 　　　　In his third amended complaint plaintiff alleges that he was retaliated against for

21 engaging in protected conduct. Specifically, plaintiff has alleged as follows:

22 　　　　<u>First Cause of Action (First Amendment - Jailhouse Lawyer Activities)</u>
   　　　　Defendants have violated plaintiff's rights guaranteed by the First
23 　　　　Amendment to the U.S. Constitution in that his (A) confinement in
   　　　　the S.H.U., (B) the false reports, (C) the theft of his property and
24 　　　　affidavits to cover up that theft, (D) the false statements and

25 _____

26 　　[4] This is the second summary judgment motion filed in this action. The first such motion was filed by plaintiff and was denied by order filed February 22, 2008.

documentation used to retain plaintiff in ad-seg, (E) the refusal to provide documentation necessary to defend confinement in ad-seg, (F) the repeated loss of and denial of plaintiff's administrative appeals, (G) the coersion [sic] and attempted coersion [sic] of inmates to fabricate evidence against plaintiff, (H) the threats, (I) are based wholly or in part upon plaintiff's legal and legitimate jailhouse lawyer activities related to and in furtherance of providing legal assistance to other prisoners, (J) and of pursuing his own claims, (K) and in that said jailhouse lawyer activities did not consist of and were not in furtherance of any illegal prison gang or activity whatsoever.

Second Cause of Action (First Amendment - Retaliation)
Defendants, and each of them, have further violated plaintiff's First Amendment rights in that his confinement in the S.H.U., and the false documentation placed in plaintiff's prison files, constitute retaliatory action taken against plaintiff for the exercise of his constitutionally protected right to engage in legal and legitimate jailhouse lawyer activities related to and in the furtherance of pursuing his own claims and providing legal assistance to other prisoners, where such jailhouse lawyers activities were not for the purpose of engaging in or furtherance of any illegal activity whatsoever.

Eighth Cause of Action (First Amendment - False Allegations)
Defendant McKean violated plaintiff's First and Fourteenth Amendment[5] rights when he retaliated against plaintiff for exercising protected jailhouse lawyer activities by falsely alleging that plaintiff breached regulations.

Ninth Cause of Action (First Amendment - False Allegations)
Defendant Bartos violated plaintiff's First and Fourteenth Amendment[6] rights when he retaliated against plaintiff for exercising protected jailhouse lawyer activities by falsely alleging that plaintiff breached regulations.

(Third Am. Compl. at 14-15.)

Plaintiff contends that these acts were taken against him in retaliation for engaging in litigation and utilizing the prison administrative grievance procedure. Specifically, plaintiff alleges that defendants retaliated against him for filing a § 1983 civil rights lawsuit in

/////

---

[5] Plaintiff's Fourteenth Amendment claim was dismissed by order filed December 7, 2005.

[6] See fn. 5, supra.

the case of <u>Lopez v. Hada</u>, CIV S-94-0891 FCD JFM P (E.D. Cal.) on June 7, 1994[7], and for

filing more than twenty grievances against HDSP staff from 1997 through 1999.  (Third Am.

Compl. ¶34 at 2.)

    A.  <u>Legal Standards Governing Claims of Unlawful Retaliation</u>

    Retaliation by a state actor for the exercise of a constitutional right is actionable

under 42 U.S.C. § 1983 even if the act, when taken for different reasons, would have been

proper.  <u>Mt. Healthy City Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 283-84 (1977).  Although

retaliation is not expressly referred to in the Constitution, it is actionable because retaliatory

actions may tend to chill the exercise of constitutional rights.  <u>Perry v. Sindermann</u>, 408 U.S. 593

(1972).

    "Within the prison context, a viable claim of First Amendment retaliation entails

five basic elements:  (1) An assertion that a state actor took some adverse action against an

inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a

legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005)

(footnote omitted).  A prisoner must establish that the protected conduct was a substantial or

motivating factor for the alleged retaliatory acts.  <u>See</u> <u>Mt. Healthy City Board of Ed.</u>, 429 U.S. at

285-86.  However, retaliatory motive may be inferred from the timing and nature of the alleged

retaliatory activities.  <u>See</u> <u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310, 1314-16 (9th Cir.

1989).  Nonetheless, a mere allegation of a retaliatory motive is insufficient to defeat a motion

for summary judgment.  <u>See</u> <u>Barnett v. Centoni</u>, 31 F.3d 813, 815-16 (9th Cir. 1994).

    Prisoners may not be retaliated against for exercising their right of access to the

courts.  <u>Schroeder v. McDonald</u>, 55 F.3d 454, 461 (9th Cir. 1995); <u>Rizzo v. Dawson</u>, 778 F.2d

---

    [7] Plaintiff alleges that this civil action stemmed from an incident at an institution other than HDSP and that a verdict in favor of defendant Hada following a three-day trial was eventually entered.

527, 532 (9th Cir. 1985) (retaliation for prisoner's work as jailhouse lawyer is prohibited).  "The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances[.]"  Soranno's Gasco, Inc., 874 F2d at 1314.  This constitutional prohibition bars retaliation for initiating litigation (Soranno's Gasco, Inc., 874 F.2d at 1314) as well as for using a prison grievance system (Hines v. Gomez, 108 F.3d 265, 267 (9th Cir. 1997) and  Bradley v. Hall, 64 F.2d 1276, 1279 (9th Cir. 1995)).

For purposes of evaluating a retaliation claim, an adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity.  Pinard v. Clatskanie School Dist., 467 F.3d 755, 770 (9th Cir. 2006); White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000).

The Ninth Circuit has found that preserving institutional order, discipline and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation.  Barnett, 31 F.3d at 816; Rizzo, 778 F.2d at 532; see also Martin v. Hurtado, Civil No. 07cv0598 BTM (RBB), 2008 WL 4145683, *6 (S.D. Cal. Sept. 3, 2008).  The burden is on plaintiff to demonstrate that legitimate correctional purposes did not motivate the actions by prison officials about which he complains.  Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995).  The Ninth Circuit has also held that, "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation[.]"  Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003).

In Bruce the district court had granted summary judgment in favor of defendants on plaintiff's claim that when prison officials validated him as a prison gang affiliate, they did so in retaliation for his jailhouse lawyering activities.  351 F.3d at 1286.  The Ninth Circuit reversed, finding that the plaintiff had presented some evidence that the accusation of gang activity was improperly motivated and, when coupled with the suspect timing of the investigation and stale nature of the evidence relied upon, raised a triable issue of fact regarding whether the

1    motive behind the gang validation was retaliatory.  Id at 1288-89.  In this regard, the court

2    observed:

> But, if, in fact, the defendants abused the gang validation procedure
> as a cover or a ruse to silence and punish Bruce because he filed
> grievances, they cannot assert that Bruce's validation served a valid
> penological purpose, even though he may have *arguably* ended up
> where he belonged.

6    Bruce, 351 F.3d at 1289.  See also Powell v. Miles, No. CV 03-1819-PHX-JAT, 2006 WL

7    2547359, *6-7 (D. Az. Aug. 30, 2006) (summary judgment in favor of defendant denied because

8    inconsistent explanations created a genuine issue of material fact concerning whether the

9    defendant segregated plaintiff in the secured housing unit for retaliatory purposes).

10         Below, the court will apply these legal standards to each aspect of plaintiff's

11    retaliation claim.

12         B.  Placement and Retention in Administrative Segregation

13         As noted above, plaintiff contends that he was placed in administrative

14    segregation[8] in retaliation for his litigation and jailhouse lawyer activities.  He also alleges that

15    false statements and documentation were used to place him in the administrative segregation and

16    retain him there.

17         1.  Defendants' Arguments

18         Defendants move for summary judgement in their favor on this aspect of

19    plaintiff's retaliation claim.  Defendants argue that they did not have plaintiff placed and retained

20    in administrative segregation to retaliate against him for engaging in any protected conduct but

21    instead acted in furtherance of the legitimate penological goal of isolating and segregating gang

22    members from the general prison population.  (Defs.' P. & A. at 4-6.)  They also assert that the

23    evidence before the court, in the form of the defendants' declarations, establishes that none of the

24    /////

25

26         [8]  Referred to by plaintiff as the "S.H.U.," an acronym for a Secured Housing Unit.

9

1  defendants involved in plaintiff's validation as a gang member and placement in administrative

2  segregation were even aware of his previous complaints against prison staff.  (Id.)

3          According to defendants Adams, Babich, Cook, Garate, Gilliam, McClure,

4  Morton, Nergenah and Vanderville, the evidence establishes that their involvement in plaintiff's

5  placement and retention in administrative segregation was limited to the following.  On February

6  2, 2000, defendant Garate issued a CDC 114-D, ordering that plaintiff be placed in

7  administrative segregation based on confidential information received on January 30, 2000,

8  implicating plaintiff as part of the Northern Structure gang hierarchy.  (Defs.' Statement of

9  Undisputed Facts (DSUF), Ex. D) (Doc. No. 157, Part 4 at 2 - Adseg Placement Notice).[9]  On

10  February 10 and March 2, 2000, defendant Vanderville attended plaintiff's classification

11  committee hearings and agreed with the committee's decision to retain plaintiff in administrative

12  segregation pending the outcome of the investigation into his gang affiliation.  (Vanderville Decl.

13  in Support of MSJ, ¶ 3 of 2) (Doc. No. 157, Part 10 at 6).

14          On March 22, 2000, defendant Morton, a now retired former classification staff

15  representative, approved the classification committee's request that plaintiff be retained in

16  administrative segregation while the gang investigation continued.  (Morton Decl. in Support of

17  MSJ, ¶¶ 1, 3 at 1-2) (Doc. No. 157, Part 9 at 8).   He also approved two extensions to retain

18  plaintiff in administrative segregation.  In his declaration filed in support of the pending motion,

19  Morton states:

20          I did not conspire with any other correctional officer to violate
           Lopez's constitutional rights, nor were any of my actions taken for
21          the purpose of retaliating against him for exercising his
           constitutional rights. . . . Releasing Lopez from administrative
22          segregation before the IGI investigator could complete his work
           might have released an active gang member into the general

23

24  /////

25  _____

26          [9]  This latter citation form will be used to refer to supporting documents as they appear in
    the court's CM/ECF docket.

1    population, endangering the safety and security of the institution,
     inmates and staff.

2

3    (Id. ¶ 4 at 2.)

4            Defendant Captain Cook attended classification committee (ICC) meetings with

5    respect to plaintiff on March 30, 2000, April 27, 2000, May 25, 2000, June 22, 2000, and July

6    20, 2000.  (Cook Decl. in Support of MSJ, ¶ 4 at 2) (Doc. No. 157, Part 7 at 10).  In his

7    declaration Cook states:

8            At each of those hearings, I put on the record that IGI had
             discovered eleven points for validation and was in the process of
9            preparing a validation package.  To the best of my knowledge, that
             statement was true each time it was entered in the record.  My
10           verification of the information in his file had nothing to do with
             any grievances or lawsuits Lopez filed against me or other staff.
11           As a member of the committee, I was obligated to review Lopez's
             central file and present information to the committee relevant to
12           determining whether Lopez should be retained in administrative
             segregation.  The status of the investigation into Lopez's gang
13           affiliation was a relevant consideration.

14   (Id.)

15           Defendant Nergenah is a classification staff representative.  On July 5, 2000, he

16   approved the classification committee's May 25, 2000 request for a 120-day extension of

17   plaintiff's placement in administrative segregation while the gang investigation continued.

18   (Nergenah Decl. in Support of MSJ, ¶ 3 at 2) (Doc. No. 157, Part 9 at 10).  Defendant Nergenah

19   likewise declares that he did not retaliate against plaintiff but rather took steps to retain plaintiff

20   in administrative segregation only for safety and security reasons while the gang affiliation

21   investigation continued.  (Id. ¶ 4 at 2.)

22           Defendant Correctional Lieutenant Adams attended plaintiff's October 12, 2000

23   classification hearing and declares as follows:

24           I verified the information that was recorded on the CDC 128-G
             form, including the fact that the institutional gang investigation
25           unit had found 11 points for validating Lopez.  As a member of the
             committee, I was obligated to review Lopez's central file and
26           present information to the committee relevant to determining

11

1    whether Lopez should be retained in administrative segregation.
2    The status of the investigation into Lopez's gang affiliation was a
     relevant consideration.

3    (Adams Decl. in Support of MSJ, ¶ 4 at 2) (Doc. No. 157, Part 7 at 3.)   The CDC 128-G

4    classification chrono referred to by Lieutenant Adams noted:

5    LOPEZ was initially placed into ASU on 2/2/00 from Facility A
     due to information that was received that implicates you as being
6    part of the Northern Structure hierarchy on Facility A and
     confidential information as indicated on CDC 1030.  LOPEZ is
7    currently pending IGI investigation, noting IGI has discovered 11
     points for validation, and will be retained pending the outcome.
8

9    (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, Ex. 46-G) (Doc. No. 122  Part 2 at 73).

10   Correctional counselor defendant Babich attended plaintiff's November 9, 2000

11   classification hearing and "verified the information that was recorded on the CDC 128-G form,

12   including the fact that the institutional gang investigation unit had found 11 points for validating

13   Lopez." (Babich Decl. in Support of MSJ, ¶ 3 at 2) (Doc. No. 157, Part 7 at 5-6).  At that time

14   the classification committee decided to retain plaintiff in administrative segregation "pending

15   outcome of the validation process."  (Pl.'s Decl., Ex. 46-H) (Doc. No. 122, Part 2 at 75).

16   Defendant Captain McClure attended plaintiff's classification hearings on March

17   2, 2000, December 7, 2000 and January 4, 2001 and declares that his actions at the hearings

18   "were motivated only by a desire to appropriately house Lopez in light of all his case factors,

19   including but not limited to his gang validation." (McClure Decl. in Support of MSJ, ¶ 3 at 2)

20   (Doc. No. 157, Part 9 at 2).  Defendant McClure also declares that plaintiff's transfer from HDSP

21   "had nothing to do with any pending legal matters" but rather "[h]e was transferred in order to

22   place him in a SHU unit, pursuant to his validation as a member of the Northern Structure prison

23   gang."  (Id. ¶ 4 at 2.)

24   Defendant Gilliam is a correctional counselor at HDSP and during 2000 acted as a

25   recorder at some of plaintiff's classification hearings.  (Gilliam Decl. in Support of MSJ ¶ 3 at

26   /////

1  29) (Doc. No. 157, Part 8 at 4).  He declares merely that "[a]t all such hearings, I did my best to

2  record information accurately."  (Id.)

3          In short, each of the defendants have declared that when they took actions related

4  to plaintiff's placement and retention in administrative segregation they were not aware of his

5  prior complaints or grievances brought against prison staff and were instead motivated to act in

6  furtherance of the legitimate penological goal of isolating and segregating gang members from

7  the general prison population.  Given the undisputed nature of the evidence in this regard,

8  defendants argue they are entitled to summary judgment in their favor.

9              2.  Plaintiff's Arguments

10         In his opposition to the pending motion for summary judgment plaintiff contends

11  that his placement in administrative segregation was extended several times by the classification

12  committee due to defendant Cook "falsely alleging that I.G.I. had 11 points to validate me[.]"

13  (Opp'n at 6.)  Similarly, plaintiff argues that defendants McClure and Babich kept him in

14  administrative segregation under the "false pretext that 11 points existed to validate me as a gang

15  member. . . ."  (Id. at 20.)  As to defendants' declarations stating that they were unaware of his

16  previous complaints made against prison staff, plaintiff argues that such statements are not

17  credible because he also lodged administrative complaints while incarcerated at HDSP and those

18  grievances were in his central files which the classification committee and CSR members were

19  required to review.  (Id. at 11.)

20         The court notes that in his third amended complaint, plaintiff alleges that

21  defendant Cook demonstrated a retaliatory motive by making statements concerning plaintiff's

22  legal activities, such as, telling plaintiff that his grievances "made him like a grain of sand in

23  staff[']s eyes" and that Cook added, "'What do you do?  You remove it.'"  (Third Am. Compl. ¶

24  81 at 9.)  Plaintiff also alleged that at the conclusion of the February 8, 2001, classification

25  hearing where he was designated for indeterminate placement in the S.H.U., defendant Cook

26  leaned close to plaintiff and said, "'File on that, you'll never get out now.'"  (Id. ¶ 84 at 10.)

1    The court also notes that in his declaration in support of his own previously filed

2    motion for summary judgment, plaintiff states that on December 10, 1999, defendant McKean

3    took plaintiff into an office and, in connection with plaintiff's filing of lawsuits, said that "we

4    won't be having that around here." (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, at

5    9.) According to plaintiff, McKean also threatened plaintiff by warning him that both McKean

6    and other officers in the guard tower had shot prisoners before. (Id.) Plaintiff has submitted the

7    declaration of fellow inmate Daniel Quint in which Quint states that on January 28, 2000,

8    defendant Garate threatened to bring a false disciplinary charge against him and other inmates

9    unless they provided information against plaintiff, whether true or not. (Pl.'s Decl. in Support of

10   Pl.'s MSJ filed April 18, 2007, Ex. 54.)[10]   In another declaration previously submitted by

11   plaintiff, inmate Everett Gonzalez states that when they met in 2000 plaintiff was knowledgeable

12   in the law and helped Gonzalez in defending against disciplinary charges and pursuing prison

13   grievances. (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, Ex. 83.) Gonzalez

14   declares that he saw numerous correctional officers "harass, provoke and mock" plaintiff and that

15   on one occasion defendant Bartos yelled in front of the entire section of inmates, "just to let

16   everyone know, pretty soon all these TV's will be out of here due to that guy [plaintiff] rattings

17   (sic) on C/O's and fileing (sic) 602's." (Id.) Gonzalez also states that he told another

18   correctional officer about these incidents. (Id.) Finally, plaintiff has previously submitted the

19   declaration of inmate Jesse Washington who declares that from 2002 through 2004, he has

20   witnessed prison officials at HDSP erroneously validate African American and Latino

21   (Northerner) inmates, including plaintiff, as gang members under the guise of institutional

22   security grounds. (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, Ex. 96.)

23   /////

24

25   _____

     [10]  Quint also states in his declaration that another correctional sergeant asked, "Where is
     the legal begal (sic) Lopez, the one we could not get on 'C' yard?" (Pl.'s Decl. in Support of
26   Pl.'s MSJ filed April 18, 2007, Ex. 54.)

1    As noted, defendants elected not to respond to plaintiff's opposition to the

2  pending motion.

3    3.  Discussion

4    The court has reviewed defendants' motion and the evidence filed in support

5  thereof, as well as plaintiff's third amended complaint, his voluminous declaration filed in

6  support of his own motion for summary judgment along with the 101 exhibits attached thereto,

7  and his opposition to the defendants' motion for summary judgment.  The question here is

8  whether the defendants, or any of them, are entitled to summary judgment on plaintiff's claim

9  that each acted to place him in and retain him in administrative segregation in retaliation for his

10  protected legal activities.

11    Plaintiff has presented no evidence that defendants Bartos and McKean were

12  involved in any way in his placement and retention in administrative segregation.  Accordingly,

13  those defendants are entitled to summary judgment in their favor on this claim.  Likewise, while

14  defendants Adams, Babich, Gilliam, Harrison, Holmes, Johnson, McClure, Martinez, Morton,

15  Nergenah, Shaver, Statti and Vanderville apparently played some role in plaintiff's placement

16  and retention in administrative segregation, they have declared that they did not take any actions

17  for the purpose of retaliating against plaintiff for exercising his constitutional rights.  Plaintiff has

18  not responded to those declarations by providing any evidence calling the motivation of these

19  individual defendants into question.  Therefore, they too are entitled to summary judgment in

20  their favor on this aspect of plaintiff's retaliation claim.

21    However, the same cannot be said with respect to defendants Cook and Garate.

22  Defendant Garate issued the initial order for plaintiff to be placed in administrative segregation.

23  (Garate Decl. in Support of MSJ, ¶ 4 at 2.)  Sergeant Garate declares that he issued this order

24  based on his understanding that confidential information had been received implicating plaintiff

25  as part of the Northern Structure prison gang hierarchy and not for purposes of retaliating against

26  plaintiff.  (Id.)  Defendant Correctional Captain Cook attended five classification committee

1  hearings regarding plaintiff's retention in administrative segregation and at each of those

2  hearings he placed on the record that Institutional Gang Investigations had discovered eleven

3  points for validating plaintiff as a gang member and was in the process of preparing a validation

4  package.  (Cook Decl. in Support of MSJ, ¶ 4 at 2.)  Captain Cook declares that his actions were

5  not taken for the purpose of retaliating against plaintiff.  (Id.)

6            In response plaintiff has presented evidence that within a month of issuing the

7  order placing him in administrative segregation, defendant Garate threatened to bring a false

8  disciplinary charge against other inmates unless they provided information implicating plaintiff,

9  whether true or not.  (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, Ex. 54.)

10  Similarly, plaintiff states that defendant Cook demonstrated retaliatory motives for his actions by

11  making statements suggesting to plaintiff that he would be "removed" if he continued his

12  jailhouse lawyer activities and in whispering to plaintiff at the end of the hearing where he was

13  designated for indeterminate confinement in administrative segregation, "File on that, you'll

14  never get out now."  (Third Am. Compl. at ¶¶ 81 & 84.)[11]   This conflicting evidence is sufficient

15  to raise a triable issue of fact regarding whether defendant Garate's motives in placing plaintiff in

16  administrative segregation and defendant Cook's motives in acting to retain plaintiff there, were

17  retaliatory.  See Bruce, 351 F.3d at 1289-90 ("Because Bruce raised a jury issue that the stated

18  penological goals were not legitimate, summary judgment was not appropriate on the retaliation

19  claim."); Powell, 2006 WL 2547359 at *6-7.

20            Therefore, summary judgment should be granted in favor of defendants Adams,

21  Babich, Bartos, Gilliam, Harrison, Holmes, Johnson, McClure, McKean, Martinez, Morton,

22  Nergenah, Shaver, Statti and Vanderville as to plaintiff's claim that his retention in

23  administrative segregation was retaliatory and denied as to defendants Garate and Cook.

24  /////

25

26       [11]  Defendants have not addressed plaintiff's evidence, electing not to file a reply brief in support of their motion.

C.  Plaintiff's Actual Gang Validation

Plaintiff also claims that his gang validation was carried out by the defendants in retaliation for his involvement in protected legal activities.  The gang validation process was described by defendant Harrison in his declaration, as follows:

> Investigations into an inmate's gang involvement are conducted by an Institutional Gang Investigations (IGI) officer at the institution where the inmate is housed.  When the IGI officer has gathered enough information to present at least three points of validation, the officer forwards the gang validation package to the Special Services Unit.  An SSU official verifies that the items meet validation requirements.  Under former California Code of Regulations, title 15, section 3378(c)(4), gang identification requires at least three independent source items of documentation indicative of association with validated gang members or associates.  One of those items must show a direct link between the inmate and a validate[d] gang member or associate.  Where information is obtained from a confidential informant, the SSU official confirms that the material contains some indicia of reliability.

> * * *

> The SSU official does not determine the housing placement for an inmate who has been validated.  Instead, the official approves the validation, then sends the 128-B recording that information to the institution where the inmate is housed.  The institution's classification committee then determines the housing placement for the inmate.

> * * *

> When information from a confidential informant is used to validate an inmate, the inmate is given a copy of a CDCR 1030 form that summarizes the content of the information without giving away the identity of the informant.  The 1030 is not used to validate the inmate, but only to summarize for him the information that is used to validate him.

> The danger that gangs present to the safety and security of prisons is so immediate and severe that prison officials often cannot wait until their investigation into an inmate's gang affiliation is complete before segregating the inmate from the general population.  By continuing their investigation after the inmate is segregated, prison officials ensure that they have the time to

/////

1       conduct a thorough and complete investigation without
      endangering the safety and security of the institution, staff, and
2       other inmates.

3 (Harrison Decl. in Support of MSJ, ¶¶ 4, 6, 8-9 at 2-3) (Doc. No. 157, Part 8 at 5-8).

4       On October 10, 2000, defendants Shaver and Johnson issued a gang validation

5 chrono documenting the following ten items to validate plaintiff as a Northern Structure gang

6 member:

7       Item (1) Debrief [sic] dated 07-22-1997 authored by C. King
      (direct link)
8

      Item (2) Confidential Memo dated 12-02-1998 authored by R.S.
9       Johnson

10       Item (3) Debrief dated 12-28-1999 authored by R.S. Johnson
      (direct link)
11

12       Item (4) Debrief dated 06-08-2000 authored by R.S. Johnson

      Item (5) 128b dated 04-12-2000 authored by K. Holmes (direct
13       link)

14       Item (6) 128b dated 10-03-2000 authored by D.D. Shaver (direct
      link)
15

      Item (7) 128b dated 10-03-2000 authored by D.D. Shaver (direct
16       link)

17       Item (8) 128b dated 10-03-2000 authored by D.D. Shaver (direct
      link)
18

      Item (9) 128b dated 10-05-2000 authored by D.D. Shaver (direct
19       link)

20       Item (10) 128b dated 10-05-2000 authored by M. Martinez 128 b
      dated 10-05-2000 authored by D.E. Hansen.
21

22 (DSUF, Ex. F) (Doc. No. 157, Part 4 at 6)[12]

23       On November 15, 2000, defendant Harrison, a special agent with the Special

24 Services Unit of CDCR, reviewed the validation package on plaintiff and concluded that six of

25 _____

26     [12] Items 1, 2 and 3 above were filed with the court under seal on October 12, 2000.  (Doc.
No. 161.)

18

1   the ten items met the gang validation requirements.  (Id., Ex. G) (Doc. No. 157, Part 4 at 8.)

2   Those items were identified as:  "Debrief dtd. 07/22/97; Conf. mem dtd 12/2/98; Debrief dtd

3   12/28/99; Debrief dtd 06/08/00; CDC 128-B dtd 4/12/00; CDC 128-B 10/05/00."  (Id.)  Based on

4   that information, defendant Harrison approved the validation of plaintiff as a member of the

5   Northern Structure prison gang.  (Id.)

6          1.  Defendants' Arguments

7          Defendants argue that in validating plaintiff as a gang member, they did not do so

8   to retaliate against him, but rather acted in furtherance of the legitimate penological goal of

9   identifying and segregating gang members from the prison population.  (Defs.' P. & A. at 4.)

10  Defendants have provided brief declarations affirming their legitimate motives in investigating

11  plaintiff's gang involvement, their good-faith belief that the information they relied on was

12  reliable and their statements that they were unaware of plaintiff's prior complaints against staff.

13  (Id. at 6.)

14         Defendant Johnson is retired and a former correctional lieutenant at HDSP.

15  (Johnson Decl. in Support of MSJ, ¶ 1 at 1-2) (Doc. No. 157, Part 8 at 12-13).  As noted, he

16  submitted the package on October 10, 2000 setting forth ten points for plaintiff's gang validation.

17  (Id. ¶ 3 at 2; see also DSUF, Ex. F.)  Defendant Johnson contends that he "would not have

18  discharged the duties of my job unless I submitted the validation package for approval."

19  (Johnson Decl. ¶ 4 at 2.)

20         Along with defendant Johnson, defendant Shaver submitted the gang validation

21  package on October 10, 2000.  (DSUF, Ex. F.)  On October 3 and 5, 2000, defendant Shaver also

22  searched plaintiff's property for evidence of gang activity and generated a 128-B concerning

23  those searches which was included in the validation package.  (Shaver Decl., ¶ 3 at 2) (Doc. No.

24  157, part 10 at 2.)  Defendant Shaver declares that his actions in this regard were not taken for

25  the purpose of retaliating against plaintiff for exercising his constitutional rights.  (Id. ¶ 4 at 2.)

26  /////

1    Defendant Harrison represents that his responsibilities were limited to

2 determining if the items listed in the package satisfied validation requirements.  (Harrison Decl.,

3 ¶ 4 at 2.)  He determined that six of the ten listed items satisfied the regulatory criteria for gang

4 validation and based on this information, approved plaintiff's validation as a Northern Structure

5 gang member.  (Id., ¶ 5 at 2; see also, DSUF, Ex. G.

6    2.  Plaintiff's Arguments

7    Plaintiff argues that the information relied upon for his gang validation was

8 "fabricated" because inmates were threatened and pressured by the defendants to provide false

9 information.  (Opp'n at 17.)   Plaintiff has previously submitted declarations from inmates Chris

10 Gomez, Daniel Quint, and Tony James in support of his contention that inmates were coerced and

11 threatened to provide such false information.  (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18,

12 2007, Exs. 54, 55, 56.)[13]  Inmate James describes how he was pressured by defendant Garate to

13 provide information implicating other inmates even if he had to lie.  (Id., Ex. 55.)  Inmate Gomez

14 has provided a declaration presenting similar allegations as those made by inmate James with

15 respect to being improperly pressured and threatened by defendant Adams in an effort to obtain

16 information implicating other inmates.  (Id., Ex. 56.)

17    Plaintiff also argues that the confidential memorandum and CDC 128-B's relied

18 upon in validating him as a gang member were subsequently deemed unreliable by Officer

19 Comfort who conduced a S.H.U. audit on December 8, 2004.  (Opp'n at 17; Pl.'s Decl., Ex. 74.)

20 In that audit, Officer Comfort did not reverse plaintiff's gang validation but did find that some of

21 the supporting documentation was confusing, "generic and nonspecific" and that "ICC noted and

22 relied upon a 'flimsy file' in review of inmate's case factors."  (Pl.'s Decl., Ex. 74 at 1.)

23 Accordingly, Comfort referred the case back to the caseworker for follow-up and extended

24 /////

25 _____

26    [13]  The relevant contents of inmate Quint's declaration have been summarized above and
     will not be repeated here.

1    plaintiff's S.H.U. placement for sixty-days to allow for completion of additional work on the

2    investigation.  (Id.)

3            Lastly, plaintiff refers to a classification committee chrono dated November 9,

4    1999, in which it was noted:

5            [I]nmate Lopez was refered [sic] to the CSR and on 11/2/99 this
             case [sic] was defered [sic] requesting review by the IGI
6            [Institutional Gang Investigations].  Committee also notes CDC 128
             B dated 11/8/99 from the Investigative Services Unit stating that
7            there is not enough information to validate Inmate Lopez.

8    (Pl.'s Decl., Ex. 35.)  (See also Defs.' Response to Pl.'s Statement of Facts in Support of Pl.'s

9    MSJ, filed Aug. 3, 2007 at ¶¶ 31, 32, 34.)  Finally, plaintiff contends that in November of 1999,

10   defendant Holmes reviewed plaintiff's prison files and determined that there was insufficient

11   information upon which to validate him as a gang member.  (Opp'n at 3.)

12           Based upon this evidence and these allegations, plaintiff contends that defendants

13   in fact validated him as a gang member in retaliation for his engaging in protected legal activities

14   and that their motion for summary judgment should be denied in this respect.

15           3.  Discussion

16           From the evidence before the court it appears that only five of the named

17   defendants were involved in plaintiff's actual gang validation.  Defendants Johnson and Shaver

18   submitted the gang validation package which set forth the original ten items for validation.

19   Defendant Harrison  reviewed the package and ultimately approved plaintiff's gang validation

20   based on six of those ten items.  Defendants Holmes and Martinez, in addition to defendants

21   Johnson and Shaver, authored reports documenting confidential information regarding plaintiff's

22   gang involvement.[14]  Plaintiff has pointed to no evidence before the court that defendants Adams,

23   Babich, Bartos, Cook, Garate, Gilliam, McClure, McKean, Morton, Nergenah, Statti or

24   /////

25

26           [14]  Similar reports were also authored by Officer King who was not named as a defendant
     and Officer Hansen who was dismissed earlier from this action.

                                        21

1  Vanderville played any role in his validation as a gang member.  Accordingly, those defendants

2  are entitled to summary judgment in their favor on this aspect of plaintiff's retaliation claim.

3          Plaintiff primarily seeks to show a retaliatory motive on the part of defendants

4  Harrison, Holmes, Johnson, Martinez and Shaver by attacking the reliability of the evidence relied

5  upon to validate him as a gang member.  Plaintiff's basic premise is that the evidence used to

6  validate him was unreliable or false and that defendants must have had a retaliatory motive if they

7  relied on such evidence.  See Bruce, 351 F.3d at 1288 (although not conclusive of a retaliatory

8  motive, reliance on evidence for gang validation that was previously found to be insufficient tends

9  to show that the validation was not motivated by legitimate purposes).

10          It must be kept in mind that plaintiff bears the ultimate burden of showing that

11  defendants Johnson, Shaver, Harrison, Holmes and Martinez  took actions to validate him as a

12  gang member due to his involvement in protected conduct.  Each of those defendants have

13  submitted declarations stating that they did not do so.  Plaintiff has presented no evidence

14  reflecting a retaliatory motive on their part.  Merely presenting evidence that a defendant knew

15  about plaintiff's involvement in protected activity prior to taking the challenged action is not

16  sufficient to raise a genuine issue of material fact on the question of whether the defendant acted

17  with a retaliatory motive.  Keyser v. Sacramento City Unified School District, 265 F.3d 741, 751

18  (9th Cir. 2001) (and cases cited therein).   For this reason alone, the five identified defendants are

19  entitled to summary judgment on this aspect of plaintiff's retaliation claim.

20          Nonetheless, the court will now turn to plaintiff's arguments challenging the

21  reliability of the validation evidence.  As noted, plaintiff first argues that the information was

22  unreliable because inmates were pressured to provide false information about gang activities.

23  However, plaintiff has not presented any evidence that false information provided by these

24  inmates was relied upon by officials in validating him as a gang member.  Thus, the inmate

25  declarations relied upon by plaintiff do not establish a genuine issue of material fact precluding

26  summary judgment.

1      Second, plaintiff points to the S.H.U. audit conducted by Officer Comfort in

2  December of 2004, as indicating that his gang validation four years earlier in October of 2000 was

3  based on unreliable evidence.  However, the 2004 audit did not find that the items relied upon for

4  plaintiff's validation in 2000 were false, but rather merely determined that the information in

5  plaintiff's file needed to be clarified, updated and documented as then required in order to support

6  the continuation of the S.H.U. term.  (Pl.'s Decl., Ex. 74.)  For these reasons, action was deferred

7  at that time and the file was returned to the case worker for completion.  (Id.)  Such evidence fails

8  to establish a disputed issue of material fact as to whether the defendants involved in plaintiff's

9  validation as a gang member in October of 2000 acted with a retaliatory motive.

10      Third, plaintiff relies upon the November 9, 1999 classification chrono which

11  acknowledges that the Investigative Service Unit had reported that as of that time there was not

12  enough information to validate plaintiff.  (Pl.'s Decl., Ex. 33.)  This evidence does raise a material

13  issue of fact as to whether plaintiff's validation in October of 2000 was carried out in retaliation

14  for his involvement in protected activity.  The chrono merely reports that there was insufficient

15  evidence to validate plaintiff as a gang member at that time.  Approximately a year later, after

16  further information was obtained, plaintiff was validated.  In sum, plaintiff has presented no

17  evidence suggesting that the five identified defendants participated in the validation process with

18  a retaliatory motive.

19      "[P]risons have a legitimate penological interest in stopping prison gang activity."

20  Bruce, 351 F.3d at 1289.  In their declaration defendants Johnson, Shaver, Harrison, Holmes and

21  Martinez state that they were simply performing their duties when they participated in plaintiff's

22  gang validation and were motivated only to serve the legitimate penological goal of identifying

23  members of prison gangs.  Plaintiff has failed to submit any evidence to the contrary.  Therefore,

24  the court finds that plaintiff has failed to establish that there is genuine issue of material fact in

25  dispute as to whether these defendants acted in a retaliatory fashion when they participated in his

26  /////

1 validation as a gang member.  Accordingly, all the defendants are entitled to summary judgment

2 in their favor as to this aspect of plaintiff's retaliation claim.

3      D.  Rules Violations

4          Plaintiff alleges in his third amended complaint that rule violation reports were

5 also issued against him in retaliation for his engaging in his protected jailhouse lawyering

6 activities.  Defendants move for summary judgment in their favor, relying on the declarations of

7 the three defendants who issued the rule violation reports in which they state that their motives in

8 issuing the charges in question were legitimate.  Defendants' arguments in this regard are

9 persuasive.

10          Plaintiff received three rules violation reports during the relevant time period.[15]

11 On June 1, 1998, defendant Holmes issued a rules violation report against plaintiff's due to his

12 refusal to submit to photographing of his tattoos.  (See DSUF, Ex. H.)  The report stated:

> On 06-01-98 at approximately 1155 hours, I attempted to
13      photograph Inmate LOPEZ, D-8627 FC86-114L, for the purpose of
> updating his gang affiliation file.  When LOPEZ came to the C Unit
14      Office, for the photographs, he refused to have his picture taken.  I
> gave Lopez a direct order to allow me to photograph him.  LOPEZ
15      again refused.

16

17 (Id.)  After a hearing on June 26, 1998, this rules violation was reduced to an administrative level

18 offense for "disobeying orders."  (Id.)  In his declaration in support of the defendants' motion for

19 summary judgment, defendant Holmes states that he attempted to photograph plaintiff for the

20 purpose of updating his gang affiliation file.  (Holmes Decl. in Support of MSJ, ¶ 3 at 2) (Doc.

21 No. 157, Part 8 at 9-11.)  Defendant Holmes declares "In my experience as a correctional officer, I

22 have frequently dealt with members of prison gangs.  Such inmates often, though not always, get

23 tattoos that indicate their gang affiliation."  (Id.)  Defendant Holmes also refers to the Department

24 Operations Manual (DOM) section 52050.18.2 which authorizes clothed body searches of inmates

25

26       [15]  Copies of the rules violation reports are attached to defendants' statement of
undisputed facts.  (Doc. No. 157.)

1  on a random basis or when reasonable cause is established.  (Id. ¶ 5 at 2.)   Defendant Holmes

2  declares that before being sued by plaintiff he was unaware of any complaints plaintiff had made

3  against correctional officers at CSP-Sacramento.  (Id. ¶ 2 at 1-2.)

4  On January 2, 2000, defendant McKean issued CDCR 115 log number FA-99-12-

5  023, charging plaintiff with delaying a peace officer and describing the incident as follows:

> On December 10, 1999, at approximately 1635 hours, while working as AA4 Floor Officer #1" [I] was requested by "A-4 Control Officer" McFarland to lock up inmate Lopez (D-86271, FAB4-203U) and inmate Norman (P-17000, FAB4-203L).  Prior to Correctional Officer McFarland asking me to assist him I overheard Correctional Officer McFarland instruct both inmates via the "Public Address System" several times to lock it up as showers had ended.  As I came out of the building office I observed inmates Lopez and Norman talking with an inmate in cell #225 and not paying any attention to the control officers [sic] instructions.  I proceeded up to the cell and instructed both inmates, Lopez and Norman, to lock up as it was count time.  Norman started toward his cell while Lopez stepped towards me and stopped in front of me at a very close distance.  Lopez then started arguing in a very loud manner that he was talking to his brother and that he was not a punk kid to be yelled at.
>
> Lopez further stated that us, meaning the officers, were not being fair to the "Northern Hispanics" on showering and that he would lock it up when he was ready.  As I continued to talk with Lopez in a calm manner I could see that Lopez was very agitated.  Lopez would continue to argue with me and at times taking steps toward me even though I would back up one or two steps for my own safety zone.  Lopez continued to argue with clenched fists down to his side and in somewhat of a "Bladed Stance" as if ready to fight.  After seeing that this might possibly lead to a physical altercation I told Lopez to finish his conversation and meet me in my office.
>
> After a few moments Lopez came into my unit office and appeared some what (sic) calmed down.  At this time I explained to Lopez if (2) to (3) cells are let out we have (6) showers and give ten (10) minute showers.  If (9) cells are let out (One section) that we give twenty (20) minutes for  showers.  Lopez continued to argue that we (The officers) were prejudice against "Northern Mexicans" and favoring other races by allowing more time.  Lopez refused to see any reasoning in the way that we ran the "Shower Program".
>
> During the course of my conversation with Lopez I told him that I expected no further problems over the times on the showers and I told him there would be no further episodes or displays that he put on today (December 10, 1999) as I did not want anyone injured over

1

> showers.  I also explained that I expected no further posturing that
> could lead to a violent situation.

2

> As this conversation continued Lopez told me that he had a federal
> lawsuit against CDC and that he was not afraid of violence and if he
> had to he would resort to such actions if he continued to be treated
> unfairly.

3

4

5   (DSUF, Ex. I at 1-2.)

6   In his declaration submitted in support of the defendants' summary judgment

7   motion, defendant McKean states that he wrote the rules violation report on the day of the

8   December 10 incident, prior to plaintiff filing his 602 appeal on December 13, 1999.  (McKean

9   Decl., ¶ 3 at 2.)  He states that the typed report was returned to him for his signature on December

10  29, 1999.  (Id.)  Plaintiff was found guilty of this rule violation by defendant Adams and was

11  assessed 90 days loss of credits and denied canteen privilege for 30 days.  (DSUF, Ex. I.)  In his

12  declaration, defendant Adams states that he found plaintiff guilty based on the preponderance of

13  the evidence.  (Adams Decl., ¶ 3 at 2.)  The disciplinary action was reviewed by defendant Facility

14  Captain Cook and defendant Associate Warden Farris.  (Id. at 1.)

15  On November 13, 2000, defendant Bartos issued CDCR 115 log number ASU-00-

16  11-0027, charging plaintiff with delaying a peace officer by refusing to exit the yard when ordered

17  to do so.  (DSUF, Ex. J.)  The report describes the incident at issue as follows:

18

> On 11/13/00, at approximately 1130 hours, while performing my
> duties as D6 Yard Observation Officer I ordered yard recall to the

19

> CC#3 Northern Hispanic/Black yard.  At approximately 1140 hours
> the inmates on the yard informed me that they were refusing to

20

> come off of the yard until they spoke to the captain.  I notified
> Correctional Sergeant Thompson and he tried to communicate with

21

> the inmates who continued to refuse orders to exit the yard.  At
> approximately 1150 hours, I ordered the inmates off the yard

22

> individually by calling their names and CDC numbers in the order
> that they went to yard; Inmate's LOPEZ, D-86271; PEREZ J-74133;

23

> MONTENEGRO, K-32878; GUZMAN, K-87999; SPARKS, H-
> 90171; OWENS, E-92965; BOR, K-4269; WILLIAMS, K-42603;

24

> JACKSON, D-47735.  All of the inmates on the yard refused to
> exit.  At approximately 1200 hours Captain Briddle addressed the

25

> inmates on the yard [.]  After Captain Briddle addressed the inmates

26  /////

1
2
> I again ordered the inmates to exit the yard.  At approximately 1300
> hours the inmates exited the yard without further incident.  All of
> the inmates addressed in the report are aware of this report.

3   (Id.)  The report notes that although there was a video tape recording of the incident, Lieutenant

4   Granish did not review it or rely upon it in finding plaintiff guilty of the rule violation.  (Id. at 2.)

5   Plaintiff was assessed 90 days loss of credit based on his involvement in this incident.  (Id. at 3.)

6          Plaintiff offers a number of arguments in opposition to defendants' motion for

7   summary judgment on this aspect of his retaliation claim.  As to the rule violation report issued by

8   defendant Holmes, he argues that the charge served no legitimate penological interest because

9   there is no rule requiring inmates to submit to such photographs.  (Opp'n at 2, 19.)  Thus, plaintiff

10  asserts that he has a "right not to be punished for disobeying a direct order . . . when no published

11  rule required I submit to photographs other than for my identification card . . . ."  ( Id. at 43.)

12         With respect to the rule violation charge issued by defendant McKean, plaintiff

13  complains that the log book shows the time when showers ended, when his section was released

14  and when count was conducted without identifying the significance of these events.  Plaintiff also

15  argues that the charge was untimely filed and claims that defendant Garate reviewed and approved

16  the violation report only after plaintiff had filed a grievance against defendant McKean.  (Opp'n at

17  19.)  Lastly, plaintiff argues in general that the hearing on this rule violation charge did not

18  comport with due process.  (Id.)

19         Finally, as to the rules violation charge issued by defendant Bartos, plaintiff merely

20  argues that "[n]o legitimate or penelogical [sic] justification exists for defendant Bartos's issuing

21  of false charges . . . for my filing complaints against prison staff. . . ."  (Opp'n at 23.)  In this

22  regard, plaintiff has alleged that on the day of this incident, he was approached by yard inmates

23  who described "conduct by rogue D-6 building staff" and sought plaintiff's advice about how "to

24  seek redress."  (Third Am. Compl. ¶ 77 at 8.)  Plaintiff contends that defendant Bartos was the

25  control booth officer at the time, that he issued the rules violation because of plaintiff's

26  /////

1  "counseling other inmates in protected and lawful redress activities" and then destroyed the

2  videotape of the incident that would have proved that the disciplinary charge was false.  (Id.)

3            Plaintiff's explanations for his conduct and his arguments attacking the rule

4  violation reports on procedural grounds miss the mark.  Of significance for purposes of the

5  pending motion is that plaintiff does not dispute that he failed to comply with orders to submit to

6  photographing (Holmes disciplinary charge), to lock up after showers (McKean disciplinary

7  charge) or to leave the yard as directed (Bartos disciplinary charge).  Plaintiff has failed to present

8  any evidence showing that these three defendants acted with a retaliatory motive in issuing these

9  rule violation reports or that the disciplinary actions taken did not serve legitimate penological

10 goals.  Therefore, the court will recommend that defendants' motion for summary judgment be

11 granted as to plaintiff's retaliation claim based on the issuance of these three rules violation

12 reports.

13       E.  Other Retaliation Claims

14            In his first cause of action, plaintiff also listed several additional acts taken against

15 him in retaliation for his engaging in protected legal activities, including "the theft of his property

16 and affidavits to cover up that theft[.]"  (Third Am. Compl. at 14.)  In opposing defendants'

17 motion for summary judgment, plaintiff contends that defendants Shaver, Holmes, and Hansen

18 rummaged through his "stored property" outside his presence.  (Opp'n at 22.)  Plaintiff asserts

19 that the defendants' actions were,

20            intended to fabricate "points" to support the false claims relied upon
            to retain me[,] that 11 points existed to validate me, to validate me
21            [sic], to unlawfully detain me, and to conspire with one another to
            do the same.  None served any legitimate or penelogical [sic]
22            justification.

23 (Id.)[16]

24 _____

        [16]  In his seventh cause of action plaintiff presented similar allegations in support of his
25 claim that defendants conducted an unlawful search of his cell in violation of the Fourth
   Amendment.  That seventh cause of action, however, was dismissed on December 7, 2005, for
26 failure to state a cognizable claim.

1    As noted above, defendant Hansen has previously been dismissed from this action

2 and defendants Holmes and Shaver have submitted declarations stating that their actions were

3 taken in furtherance of specified legitimate penological goals.  In response plaintiff merely makes

4 conclusory assertions that the challenged actions were retaliatory but fails to provide any evidence

5 in support of his claim.  Therefore, summary judgment should be granted in favor of defendants

6 with respect to these aspects of plaintiff's retaliation claim.[17]

7 II.  Fifth and Sixth Causes of Action

8    In his fifth cause of action plaintiff alleges that his Eighth Amendment rights were

9 violated when defendant Hansen ordered him placed on contraband watch, causing him to be kept

10 in physical restraints and "constant illumination of bright lights for over 26 hours[.]"  (Third Am.

11 Compl. at 15.)  In the sixth cause of action, plaintiff claims that his rights under the Fourth

12 Amendment were violated when defendant Hansen had him placed on contraband watch "without

13 legitimate, probable, or reasonable cause."  (Id.)

14    Defendants argue that defendant Hansen was dismissed from this action by order

15 filed March 14, 2007.  In opposition, plaintiff argues that he was unable to serve defendant

16 Hansen because he is no longer employed with CDCR but that because Hansen was a "key

17 participant," the court should order service of the third amended complaint on him.  (Opp'n at 24.)

18    Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, the court is

19 authorized to dismiss claims against a defendant who has not been served with process within 120

20 days after the filing of the complaint, unless the plaintiff shows good cause for failing to effect

21 service.  Plaintiff was provided several extensions of time to obtain the needed information to

22 effect service on defendant Hansen.  See Orders filed June 27, 2006 and Sept. 12, 2006; Findings

23 and Recommendations filed Nov. 14, 2006.  Plaintiff simply failed to procure the necessary

24 _____

25 [17]  Plaintiff also alleges that he was retaliated against when not provided documents necessary to challenge his placement in administrative segregation and when prison officials lost or denied his administrative appeals.  This allegation will be addressed in conjunction with the

26 due process claim set forth as the fifteenth cause of action of plaintiff's third amended complaint.

1   information through discovery and never sought leave of court to amend to add Hansen as a

2   defendant in this action after he was dismissed without prejudice pursuant to Fed. R. Civ. P.

3   41(b).  See Amended Order filed March 14, 2007.

4           Since the fifth and sixth causes of action of plaintiff's third amended complaint set

5   forth allegations only with respect to Hansen, who has previously been dismissed from this action,

6   the motion for summary judgment in favor of the remaining defendants should be granted with

7   respect to those causes of action.

8   III.  Tenth Cause of Action - "First Amendment - False Labeling"

9           In his tenth cause of action, plaintiff claims that defendant Bartos retaliated against

10  him for engaging in protected legal activity by calling him a "snitch" in front of other inmates.

11  (Third Am. Compl. at 15.)  This specific incident allegedly took place in December of 2000 and is

12  described by plaintiff as follows:

13          Defendant Bartos threatened and put plaintiff's safety in jeopardy
            when he loudly told inmates Terry and Gonzalez, while in
14          proximity of other inmates with H.D.S.P.'s D-6 ad-seg building,
            that "Inmates are ratting on officers and pretty soon these T.V's will
15          be out of here" while he pointed at plaintiff.  "Ratting" is generally
            known as "snitching" or being an "informant" and it is generally
16          known that putting such a label on a person in prison greatly
            increases that persons [sic] chances of harm or other adversities
17          such as being ostrisized [sic].  Similarly, putting plaintiff's welfare
            in jeopardy as defendant Bartos's attributing the potential loss of the
18          ad-seg televisions to plaintiff.  [sic]  In addition Defendant Bartos's
            acts, actions, and omissions served no penological or legitimate
19          justification; and violated California Constitution's Art. 1 §§ 7(a)
            and 15's due process clause; and 15 C.C.R. §§ 3004, 3084.1 et seq.,
20          3270, 3271, 3291.

21  (Third Am. Compl. ¶ 77 at 8.)

22          Defendants argue that such allegations of verbal harassment or abuse do not state a

23  cognizable claim under § 1983 and that they are entitled to summary judgment on this cause of

24  action.

25  /////

26  /////

30

1            In opposition to defendants' motion for summary judgment plaintiff points to a

2 previously submitted declaration from inmate Everett Gonzalez in which it is stated:

3            I remember on one occassion [sic] a correctional officer Barto's
           [sic] pointing at inmate Lopez cell and grabing [sic] everyone
4            attention in the section and yelling "just to let everyone know, pretty
           soon all these TV's will be out of here due to that guy ratting on
5            c/o's and fileing [sic] 602's."

6            Due to this statement by c/o Bartos the entire section began to yell,
           kick the door and some inmates threatened inmate Lopez, openly
7            yelling on the tier. c/o Bartos seeing the reaction was excited and
           was sure to point exactly at Lopez [sic] cell.

8

9 (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, Ex. 83 at 2-3.)  Plaintiff argues that the

10 physical injury requirement does not apply to First Amendment claims such as his and that

11 defendant Bartos's comments were made with the intent to cause plaintiff physical harm at the

12 hands of other inmates.  (Opp'n at 24-25.)

13            Defendants' perfunctory motion for summary judgment on this claim misses the

14 mark.  Plaintiff's allegations do not involve a mere claim of verbal harassment.  Rather, the

15 allegation is that defendant Bartos retaliated against plaintiff due to his involvement in protected

16 legal activity by making a statement about plaintiff in front of other inmates with an intent to have

17 those other inmates threaten or due harm to plaintiff.   Such an allegation states a cognizable claim

18 and, contrary to defendants' brief argument, is actionable.  Valandingham v. Bojorquez, 866 F.2d

19 1135, 1137-39 (9th Cir. 1988) (reversing grant of summary judgment where plaintiff alleged and

20 supported with an affidavit that in retaliation for filing grievances the defendant correctional

21 officers conspired to label him a "snitch" thereby subjecting him to threats of harm by other

22 inmates); see also Gornick v. California Department of Corrections, No. 1:06-cv-0296 AWI DLB

23 PC, 2008 WL 3941683, *3 (E.D. Cal. Aug. 26, 2008) (acknowledging that the allegations in

24 Valandingham involved action that were clearly adverse to plaintiff sufficient to constitute an

25 actionable retaliation claim).  Here, the allegations of plaintiff's third amended complaint are

26 supported by the declaration of inmate Gonzalez.  Defendants have presented no evidence to the

1  contrary and in his declaration before the court defendant Bartos does not even address the

2  incident in question.[18]

3         Therefore, the court will recommend that defendants' motion for summary

4  judgment be denied with respect to plaintiff's tenth cause of action in which he claims that

5  defendant Bartos retaliated against him for engaging in protected legal activity.

6  IV.  Twelfth Cause of Action

7         In his third amended complaint plaintiff makes the following convoluted

8  allegation:

9         Defendant P. Statti violated plaintiff's First Amendment rights
          when retaliating against plaintiff for plaintiff's submitting
10        documentation of defendant Statti's interfering with plaintiff's
          protected investigative services relevant to the false charges brought
11        by defendant Bartos when he illegally falsified the ultimate findings
          or that false charge, when he had plaintiff and his cellmate moved to
12        another building, and when he denied plaintiff's appeal challenging
          the violations of the investigative impediments.

13

14  (Third Am. Compl. at 16.)

15         The record concerning this claim reflects as follows.  As noted above, on

16  November 13, 2000, defendant Bartos issued a CDCR 115, identified as log number ASU-00-11-

17  0027, charging plaintiff with delaying a peace officer by refusing to exit the yard when ordered to

18  do so.  (DSUF, Ex. J.)  On December 18, 2000, plaintiff filed a inmate appeal (log 00-03364)

19  complaining that his investigative employee provided an incomplete report concerning this rule

20  violation charge.  (Id., Ex. K.)  On January 11, 2001, plaintiff's first level appeal was withdrawn

21  based on his interview with Sergeant Kelley.  (Id.)  Plaintiff's appeal was denied at both the

22  /////

23

24         [18]  This is not to say there is evidence before the court supporting the claim that plaintiff's
          exercise of his First Amendment rights was chilled by the action allegedly taken by defendant
          Bartos.  But see Rhodes v. Robinson, 408 F.3d 559, 567 n.11 (9th Cir. 2005) (suggesting that in
25        this context an allegation of harm alone would be sufficient).  However, defendants have not
          moved for summary judgment on this ground and therefore have presented no evidence or
26        argument on the issue.

1   second level by Chief Deputy Warden Colon and at the Director's Level by Linda Rianda, Chief

2   of the Inmate Appeals Branch.  (Id.)

3          In his third amended complaint, plaintiff alleges that on February 2, 2001,

4   defendant Statti had plaintiff and his cellmate's property moved from administrative segregation

5   D-6 to D-7 while they were at the prison law library.  (Third Am. Compl. ¶ 96, at 12.)  Plaintiff

6   declares that he was then retained in D-7 until February 15, 2001, when he was transferred to

7   CSP-Corcoran.  (Pl.'s Decl. in Support of Pl.'s MSJ filed April 18, 2007, ¶ 102, at 16.)

8          Plaintiff alleges that inmates housed in D-7 "were known throughout the prison as

9   being protective custody inmates, snitches, etc." and that defendant Statti actions were "in

10  retaliation for plaintiff's complaining about Statti's violating plaintiff's investigative rights . . . ."

11  (Third Am. Compl., ¶ 96 at 12.)  Plaintiff claims that defendant Statti "was told I was moved

12  because I 'filed complaints against staff, and defendant Adams said 'Lt. Statti signed the 154'

13  (move form)."  (Opp'n at 26.)  Plaintiff contends that defendant Statti conspired with defendant

14  Bartos and "as retaliation [sic] for my filing grievances, Statti denied the complaint."  (Id.)

15  Among the exhibits submitted by plaintiff are copies of documents generated by the classification

16  committee following hearings on retaining plaintiff in administrative segregation during the gang

17  validation investigation.  See Pl.'s Decl., Ex. 46, Attach. A-I; Ex. 59.  On January 4, 2001, the

18  committee recommended that plaintiff be retained in administrative segregation, noting that

19  plaintiff's "next classification appearance shall be before ASU-ICC for Subsequent Review of his

20  Ad-Seg housing placement on 02/01/01."  (Id., Ex. 46, Attach. I.)  On February 8, 2001, plaintiff

21  appeared before the classification committee for subsequent review of his placement in

22  administrative segregation.[19]  (Id., Ex. 59.)  The committee retained plaintiff on "Controlled

23  Compatible Exercise Yard #3, double cell status and single escort," noting that he had been

24  validated as a Northern Structure prison gang member and endorsed for adverse transfer.   (Id.)

25  ───────────────

26          [19]  The committee members were Colon, Evans, McClure, Nolan and Gilliam, with Cook
    as recorder.  (Pl.'s Decl., Ex. 59.)

1    At that time, plaintiff asked the committee to record his complaint that "'rogue staff' had caused

2    him problems with unit D-6 when he was removed to D-7, he states that it was adverse as he was

3    helping the inmates file case law issues in D-6 and upset the staff."  (Id.)

4          In moving for summary judgment on this claim, defendants have submitted a

5    declaration by defendant Statti in which he denies that plaintiff was rehoused in retaliation for his

6    administrative appeal filed against defendant Bartos.  (Statti Decl. in Support of MSJ, ¶ 3 at 2)

7    (Doc. No. 157).  Defendants argue that plaintiff's the administrative appeal regarding this matter

8    was denied at the second level by Chief Deputy Warden Colon, not by defendant Statti.  (MSJ at

9    8) (citing DSUF, Ex. K).  They also note that Chief Deputy Warden Colon found no evidence to

10    support plaintiff's claim of staff misconduct.

11          After reviewing the record to determine the chronology of events, the court

12    concludes that plaintiff has failed to carry his burden of presenting some evidence that defendant

13    Statti took any adverse action against him in retaliation for his engaging in protected activity.  In

14    this regard, defendant Statti has submitted a declaration denying any such conduct.  In response,

15    plaintiff has failed to present any evidence that defendant Statti had plaintiff rehoused in D-7 for

16    thirteen days prior to plaintiff's adverse transfer to CSP-Corcoran.  Moreover, the evidence before

17    the court establishes that defendant Statti did not deny plaintiff's grievance concerning the

18    investigative employee assigned with respect to the rule violation issued by defendant Bartos.

19    Given plaintiff's complete failure of proof in this regard, defendants are entitled to summary

20    judgment in their favor as to plaintiff's twelfth cause of action.

21    V.  Fourteenth and Nineteenth Causes of Action

22          In the fourteenth and nineteenth causes of action, plaintiff names only defendant

23    Singletary who was previously dismissed from this action by order filed on March 14, 2007.

24    Plaintiff having made no factual allegations with respect to any of the remaining defendants in

25    connection with these claims, summary judgment should be granted in favor of the moving

26    defendants as to plaintiff's fourteenth and nineteenth causes of action.

1   VI.   Fifteenth Cause of Action

2           In his fifteenth cause of action, described by him as a "Federal Due Process" claim,

3   plaintiff alleges as follows:

4           Plaintiff's indeterminate term in the S.H.U. violates the due process
            clause of the Fourteenth Amendments to the U.S. Constitution in
5           that defendants Garate, Farris, Cook, Hansen, Shaver, Holmes,
            McClure, Martinez, Babich, Gilliam, Vanderville, Johnson,
6           ("Defendants"):
            (i) placed plaintiff in the S.H.U. on the basis of erroneous,
7           unreliable and untrue information that does not constitute "some
            evidence." (ii) Fabricated evidence. (iii) made false statements to
8           retain plaintiff. (iv) never gave plaintiff an administrative review.
            (v) failed to give plaintiff [an] opportunity to present his views to
9           the officials making the determination that plaintiff is a gang
            member. (vi) denied evidence needed to defend against the
10          retention and allegations. (vii) failed to provide meaningful
            classification reviews.
11
            Furthermore, by placing plaintiff in the SHU when he is not a gang
12          member, defendants have placed plaintiff in an inescapable position
            that violates the fundamental principles of due process. Because
13          defendants have incorrectly labeled plaintiff a gang member,
            plaintiff can only be released by divulging information that he does
14          not have.

15   (Third Am. Compl. at 16-17.)

16          Below, the court will consider plaintiff's claim that his due process rights were

17   violated at the following three separate stages of the gang validation process:  his initial placement

18   in administrative segregation, his retention in administrative segregation, and his ultimate

19   validation as a gang member.

20          A.   Initial Placement in Administrative Segregation

21          As noted above, plaintiff alleges that his due process rights were violated by his

22   initial placement in administrative segregation on February 2, 2000. (Third Am. Compl. at 16-

23   17.) Specifically, plaintiff alleges that he was placed in administrative segregation based upon

24   false or unreliable evidence, denied access to evidence and thus the ability to refute the action

25   taken against him and was not allowed the opportunity to make his views known to the prison

26   officials making the decision to transfer him to administrative segregation. (Id. at 3, 16-17.)

1        In moving for summary judgment, defendants concede that a prisoner is entitled to

2   some due process protections prior to placement in administrative segregation.  (Defs' P. & A. at

3   11.)   Nonetheless, defendants argue that summary judgment in their favor is appropriate because

4   plaintiff received all of the procedural protections to which he was entitled when on November

5   28, 2000, almost ten months after his placement in administrative segregation, he was provided

6   information regarding the nature of the claim against him before being recommended for an

7   adverse transfer.  (Id. at 11.)   Defendants contend that at the January 2001[20] classification

8   committee hearing, plaintiff was informed of the reasons underlying his transfer, was provided the

9   opportunity to state his views and to request documents as well as to enter documents into the

10  record, and informed of his right to appeal.  (Id.)  Defendants note that the classification

11  committee provided the following summary of that hearing:

12          Since his initial placement, he has been validated per the CDC 128-
            B-2 dated 11/15/00.  Committee elects to reaffirm the 12/07/00
13          CSR referral, recommending indeterminate SHU adverse transfer to
            PBSP with an extension through date of transfer.

14                                          ***

15          Inmate LOPEZ was an active participant with this Committee and
            stated he was indifferent with [sic] Committee's decision and
16          understood his rights to appeal.

17  (Pl.' Decl., Ex. 46) (Ex. I to Def. Cook's Response to Pl.'s First Req. for Admissions, Ex. I).

18  Based on this evidence, defendants argue that plaintiff was provided all the procedural process

19  due him and that they are entitled to summary judgment in their favor.

20        Plaintiff responds that before the validation packet prepared by the Institutional

21  Gang Investigators (IGI) was submitted to the Law Enforcement and Investigation Unit (LEIU)

22  and reviewed by defendant Harrison, he had the right to contest his alleged gang affiliation.

23  (Opp'n at 33-34.)  Plaintiff contends that he was denied that procedural protection.  (Id.)  He

24

---

25         [20]  Defendants state that the classification committee hearing was held on January 11,
     2001.  However, it appears that the hearing date was actually January 4, 2001.  See Pl.'s Decl.,
26   Ex. 46 (Ex. I to Def. Cook's Response to Pl.'s First Req. for Admissions).

1 argues that he was not validated until November 15, 2000, he was not interviewed prior to that

2 date and did not receive the notice of the items of evidence relied upon until later still.  (Opp'n at

3 34.)  Plaintiff asserts that the fact that he was seen by the classification committee prior to his

4 transfer, does not cure the due process violation because once validated as a gang member,

5 assignment to the S.H.U. is routine.  (Id. at 34, 36.)  Plaintiff argues that defendants' assertions

6 that at some point he understood the nature of the allegations regarding his gang activity is

7 irrelevant because if plaintiff had received timely notice of the evidence being relied upon, he

8 would have been able to exercise his right to present his views prior to his validation.  (Id. at 36.)

9          The evidence before the court reflects as follows.  On February 2, 2000, defendant

10 Garate issued an Administrative Segregation Unit Placement Notice (CDC Form 114-D) placing

11 plaintiff in administrative segregation pending "further investigation conducted by High Desert

12 Gang Investigation Unit."  (DSUF, Ex. D.)  On March 30, 2000, plaintiff appeared before the

13 classification committee.  (Pl.'s Decl., Ex. 46, Cook's Response to Pl.'s First Req. for

14 Admissions, Ex. A).  The committee's recommendation, set forth on an ICC 128-G form,

15 provides the following summary of that hearing:

16          Inmate LOPEZ appeared before HDSP/ASU-ICC on this date for
           the purpose of Subsequent Review of his Ad-Seg placement.
17          Subject as placed in Ad-Seg on 02/02/2000 behind Confidential
           Information implicating him as being part of the 'Northern
18          Structure' hierarchy on Facility 'A'.  ASU placement due process
           rights have been met.  CDC 1030 in Central file and disclosed on
19          02/02/2000.  It is noted that case is pending IGI. . . .  Inmate LOPEZ
           actively participated in Committee discussion and adamantly denied
20          'Northern Structure' association, however was appreciative of the
           restoration of credit on this RVR.  LOPEZ was advised of his
21          appeal rights and stated he understood them.  Next appearance
           before ICC on or before 04/27/2000 for Subsequent Review of his
22          Ad-Seg placement.

23 Id.

24          Plaintiff appeared before the classification committee on a monthly basis over the

25 next four months, voiced his objection to the process, denied any gang affiliation and was told that

26 he would continue to be held in administrative segregation pending the outcome of the

1   investigation by the Institutional Gang Investigators.  Neither defendant Garate, who originally

2   ordered defendant into administrative segregation, nor any of the defendant officers from the IGI

3   Unit were apparently present at these classification committee hearings.  Defendants Shaver and

4   Johnson, of the IGI Unit, finally submitted a validation package with respect to plaintiff on

5   October 10, 2000.  Defendant Harrison approved the validation thereafter.  Eventually, on January

6   4, 2001, the classification committee recommended plaintiff for an adverse transfer based on the

7   gang validation.  That action was endorsed on February 7, 2001 and the adverse transfer was

8   ultimately executed on February 15, 2001, over one year after plaintiff was first placed in

9   administrative segregation.

10          It appears to the undersigned that defendants' motion for summary judgment is

11  misguided with respect to this aspect of plaintiff's due process claim.  Defendants have properly

12  conceded that a prisoner is entitled to due process protections prior to placement in administrative

13  segregation.  However, in this context due process requires only the following procedural

14  protections:

15          Prison officials must hold an informal nonadversary hearing within
            a reasonable time after the prisoner is segregated.  The prison
16          officials must inform the prisoner of the charges against the prisoner
            or their reasons for considering segregation.  Prison officials must
17          allow the prisoner to present his views.

18          We specifically find that the due process clause does not require
            detailed written notice of charges, representation by counsel or
19          counsel-substitute, an opportunity to present witnesses, or a written
            decision describing the reasons for placing the prisoner in
20          administrative segregation.  We also find that due process does not
            require disclosure of the identity of any person providing
21          information leading to the placement of a prisoner in administrative
            segregation.

22

23  Toussaint, 801 F.3d at 1100-01 (internal citations and footnote omitted).  See also Mathews v.

24  Eldridge, 424 U.S. 319, 333 (1976) (due process requires that an inmate be given notice of the

25  charges against him and an opportunity to be heard at a meaningful time and in a meaningful

26  manner); Bruce, 351 F.3d at 1287 (holding that due process requires that prison officials provide

38

1  the inmate with notice of the charges and an opportunity to present his views to the prison official

2  charged with deciding whether to transfer him to the SHU).  The prisoner may present his views

3  by providing a written statement or oral presentations if prison officials believe a written

4  statement would be ineffective.  Hewitt v. Helms, 459 U.S. 460, 476 (1983).  "So long as this

5  occurs, and the decisionmaker reviews the charges and then-available evidence against the

6  prisoner, the Due Process Clause is satisfied."  Id.

7          A recent Ninth Circuit decision addressed a similar issue and is instructive here.

8  See Guizar v. Woodford, No. 07-15743, 2008 WL 2403000 (9th Cir. June 11, 2008).[21]  In that

9  case the plaintiff was retained in administrative segregation for over a year pending investigation

10  of his gang affiliation.  Guizar, 2008 WL 2403000 at *1.  Plaintiff filed suit alleging that prison

11  officials had violated his due process rights throughout the lengthy process.  Id.  The Ninth Circuit

12  determined that the investigation by an institutional gang investigator, "was as a practical matter

13  the decisive basis for Guizar's gang validation and in turn for his transfer to administrative

14  segregation."  Id.  The court observed that due process requires that a prisoner have an opportunity

15  to present his views before an official decides to transfer him to administrative segregation.  Id.

16  (citing Toussaint, 926 F.2d at 803).  Although it was disputed whether the plaintiff's  requests in

17  that case for an opportunity to refute the gang validation evidence had been denied, the court

18  found that any "failure to allow Guizar to present his views regarding his gang status would

19  violate Guizar's right to due process of law."  Id. (citing Toussaint v. Rowland, 711 F. Supp. 536,

20  542 (N.D. Cal. 1989)).  See also Dawkins v. Peterson, No. CIV S-02-2038 LKK KJM P, 2007

21  WL 333818, at *6 (E.D. Cal. Jan. 31, 2007) (denying defendants' motion for summary judgment

22  and holding that before an inmate is transferred to administrative segregation for purposes of a

23  /////

24

25      [21]  Pursuant to Ninth Circuit Local Rule 36-3 unpublished dispositions issued on or after
    January 1, 2007, may be cited to the courts of the Ninth Circuit in accordance with Fed. R. App.
26  P. 32.1 but are not precedent.

1  gang validation investigation, he is entitled to an informal hearing with the institutional gang

2  investigator where the inmate can present his views ).

3          Here, the evidence currently before the court indicates that plaintiff was not given

4  the opportunity to refute the evidence against him prior to his transfer to administrative

5  segregation nor during his year in administrative segregation prior to his adverse transfer.  He also

6  apparently never received the opportunity to present his views to the gang investigators who, in

7  effect, were deciding his status.  The fact that "he may have *arguably* ended up where he

8  belonged" is irrelevant.  Bruce, 351 F.3d at 1289.  On this record, defendants have not established

9  that they are entitled to summary judgment on plaintiff's due process claim with respect to his

10  initial placement in administrative segregation.

11          Defendants have also moved for summary judgment by arguing generally that they

12  are entitled to qualified immunity.  (P. & A. at 14-15.)  In this regard they argue that all of the

13  defendants acted out of a desire to preserve the safety and security of the prison and that

14  reasonable correctional officers in their position could have believed that their conduct in

15  segregating and validating plaintiff was lawful.  (Id.)  Plaintiff opposes the granting of qualified

16  immunity on the grounds that prison officials are presumed to be aware of the law governing their

17  conduct and that he had a right to be heard at a meaningful time and in a meaningful manner.

18  (Opp'n at 40-41.)

19          It may be that defendants could be entitled to qualified immunity on plaintiff's due

20  process claim.  See Guizar, 2008 WL 2403000 at *1.  However, defendants have not moved for

21  summary judgment with any degree of specificity on qualified immunity grounds with respect to

22  this aspect of plaintiff's claim.  Moreover, as previously noted, defendants elected not to file a

23  reply brief in support of the pending motion in which they may have addressed the issue.

24  Therefore, the court will recommend that defendants' motion for summary judgment be denied

25  with respect to this aspect of plaintiff's due process claim.

26  /////

B. <u>Retention in Adseg</u>

After his initial placement in administrative segregation on February 2, 2000, plaintiff had several classification hearings where it was decided that he should be retained in administrative segregation while the gang validation investigation continued. Plaintiff alleges that his due process rights were violated by his retention in administrative segregation.

A prisoner in administrative segregation may be retained in such a placement if the following procedural protections are provided:

> Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner - which will have been ascertained when determining to confine the inmate to administrative segregation - and on the officials' general knowledge of prison conditions and tensions . . . . Likewise, the decision to continue confinement of an inmate pending investigation . . . depends upon circumstances that prison officials will be well aware of - - most typically, the progress of the investigation.

<u>Hewitt</u>, 459 U.S. at 477 n.9. <u>See also</u> <u>Toussaint</u>, 926 F.2d at 803 (due process satisfied by review of confinement in segregation every 120 days); <u>Tapia v. Alameida</u>, No. 1:03-CV-5422-AWI-SMS, 2006 WL 842470, *10 (E.D. Cal. March 29, 2006) (due process requires meaningful review of an inmate's S.H.U. confinement every 120 days); <u>Lopez v. Marshall</u>, No. C-93-2790 DLJ, 1995 WL 355592, *3 (N.D. Cal. June 2, 1995) (finding due process satisfied where "[p]laintiff has received periodic reviews of the decision to place him in segregated housing" due to gang affiliation).

The evidence before the court establishes that plaintiff received meaningful periodic reviews of his placement in administrative segregation. (<u>See</u> DSUF at 3.) However, if plaintiff did not receive the process to which he was due under the Fourteenth Amendment when initially placed in administrative segregation by being denied the opportunity to refute the reason for his segregation, then the periodic reviews of that initial decision are meaningless. For the reasons explained above, the court concludes that this is such a case. Therefore, defendants'

1 motion for summary judgment with respect to this aspect of plaintiff's due process claim should

2 be denied as well.

3     C. <u>Gang Validation</u>

4         Finally, plaintiff alleges that his due process rights were violated by his validation

5 as a gang member which he contends was not based on reliable evidence.[22] (Third Am. Compl. at

6 16-17.) In addition, plaintiff alleges that the defendants failed to allow him a timely opportunity

7 to present his views in defense against the gang allegations prior to being placed in administrative

8 segregation. Defendants do not dispute that plaintiff has a liberty interest in avoiding

9 indeterminate confinement in the S.H.U. However, defendants have moved for summary

10 judgment on this claim, arguing that there was "some evidence" to support plaintiff's validation as

11 a gang member and that he was provided all of the procedural protections to which he was entitled

12 under the Fourteenth Amendment.

13     1. <u>Some Evidence Standard</u>

14         The Ninth Circuit has held that the determination that an inmate is a gang member,

15 and therefore appropriate for assignment to an indefinite term in segregated housing, must be

16 supported by some evidence. <u>Bruce</u>, 351 F.3d at 1287. The some evidence standard sets a low

17 bar, consistent with the recognition that assignment of inmates within prisons is "essentially a

18 matter of administrative discretion, subject to minimal legal limitations. <u>Id.</u> (citations omitted).

19 Even a single piece of evidence may be sufficient to meet the some evidence requirement, if that

20 evidence has sufficient indicia of reliability. <u>Id.</u> at 1288; <u>see also</u> <u>Cato v. Rushen</u>, 824 F.2d 703,

21 705 (9th Cir. 1987) (the relevant question is whether there is any evidence in the record that could

22 support the conclusion reached by the disciplinary board); <u>Toussaint</u>, 926 F.2d at 803 (articulating

23 sufficient indicia of reliability standard). In <u>Bruce</u>, for example, the court acknowledged three

24  

25      [22] In this cause of action plaintiff names defendants Garate, Farris, Cook, Hansen, Shaver, Holmes, McClure, Martinez, Babich, Gilliam, Vanderville and Johnson. (Third. Am. Compl. at 16.) As noted above, however, Farris and Hansen have previously been dismissed

26 from this action. <u>See</u> fn. 2, <u>infra</u>.

1   pieces of evidence as supporting the identification of the plaintiff as a gang member: a sheriff's

2   department report that he was a gang associate; a probation report indicating that his codefendant

3   on the underlying charge had been validated as a gang member; and a statement from a

4   confidential informant.  Bruce, 351 F.3d at 1288.  The Ninth Circuit found that any of these three

5   pieces of evidence would have sufficed to support the validation because each has sufficient

6   indicia of reliability.  Id.

7           Here, defendants assert that Special Agent Harrison reviewed plaintiff's gang

8   validation package and confirmed that there were at least three pieces of evidence from

9   independent sources validating plaintiff as a gang member.  (Defs' P. & A. at 10.)  Because some

10  of that  information was obtained from a confidential source, defendant Harrison confirmed that

11  the reliability of the sources had been evaluated and addressed by the authors of the confidential

12  reports.  (Id.)[23]  Defendants have submitted the evidence from confidential sources for the court's

13  review.  Based upon defendant Harrison's declaration stating that he verified six items validating

14  plaintiff as a member of the Northern Structure prison gang and refuting plaintiff's challenges to

15  the evidence, apparently as well as the evidence from confidential sources filed under seal, the

16  defendants argue that the governing "some evidence" standard was met with respect to plaintiff's

17  validation as a gang member.

18          Plaintiff asserts that the "some evidence" requirement is a standard for review and

19  is not the standard prison officials are permitted to employ in ordering placement in administrative

20

21          [23]  Defendants acknowledge that some of the information relied upon for plaintiff's gang
    validation was developed after he was initially placed in administrative segregation.  They
22  contend, however, that a suspected gang member is typically segregated as the validation
    investigation continues so as to ensure a thorough and complete investigation without
23  endangering the safety and security of the institution, staff and other inmates.  (P. & A. at 10;
    Harrison Decl. at 2-3.)  Defendants contend that plaintiff's argument - that the information relied
24  upon for his validation must be false because it was generated after his segregation while
    information initially relied upon was later omitted - is misplaced.  (Id.)  Defendants argue that
25  further investigation often  properly results in some initial information being proved to be
    unreliable or less persuasive than initially thought and that fact does not call into question the
26  conclusions ultimately reached.  (Id.)

1   segregation.  (Opp'n at 34.)  Plaintiff also argues that, under the holding in <u>Toussaint</u>, it was

2   required that he be given the opportunity to challenge the gang validation evidence before it was

3   deemed sufficient by defendant Harrison.  (<u>Id.</u> at 34-35.)  Plaintiff contends that the following

4   documents established that the evidence relied upon by defendants was insufficient:  (1) the

5   December 8, 2004 S.H.U. audit referring the investigation for casework follow-up because

6   documentation was unclear and non-specific, could not be located in the file and appeared on the

7   wrong form, with the comment that there was a "flimsy file."  (Pl.'s Decl. in Support of Pl.'s MSJ

8   filed April 18, 2007, Ex. 74); (2) the classification review dated November 9, 1999, in which it

9   was reported, "Committee also notes CDC 128 B dated 11/8/99 from the Investigative Services

10  Unit stating that there is not enough information to validate Inmate Lopez." (<u>Id.</u>, Ex. 35); and (3)

11  the declarations from three inmates in which they state they were threatened by prison officials to

12  induce them to provide false information regarding plaintiff.  (<u>Id.</u>, Exs. 54-56).  (Opp'n at 35.)

13  Plaintiff argues that instead of merely pointing to "some evidence," due process requires that the

14  defendants provide three independent source items to support his gang validation.  (<u>Id.</u>)

15          Plaintiff's argument that unreliable evidence was used to validate him as a gang

16  member is based in large part on the declarations of the three inmates who contend they were

17  pressured to provide false information to prison officials about suspected gang activity.  The

18  inmate declarations do not raise a genuine dispute as to the reliability of the information relied

19  upon in connection with plaintiff's validation.  The declarants stated that although they were

20  pressured to do so, they did not provide false information to prison officials.  (<u>See</u> Pl.'s Decl. in

21  Support of Pl.'s MSJ filed April 18, 2007, Exs. 54-56.)  In addition, plaintiff's gang validation

22  was based on information derived from debriefings and actual physical evidence.

23          Plaintiff's contention that the 2004 S.H.U. audit determined that documentation

24  with respect to his validation was lacking, thus calling into question that validation, is likewise

25  unpersuasive.  That audit did not find evidence relied upon for plaintiff's validation to be false,

26  /////

1  fabricated or unreliable.  Rather, the auditor merely pointed out that there were document issues in

2  connection with the file and referred the case for updating and follow-up.  (Pl.'s Decl., Ex. 74.)

3          Finally, plaintiff's contention that his due process rights were violated because in

4  November of 1999, it was determined that evidence supporting his gang validation was

5  insufficient, is equally misplaced.  At that time the classification committee did not determine that

6  any evidence of plaintiff's gang involvement was false, fabricated or unreliable.  Instead, the

7  committee simply found that there was not enough information at that time to validate plaintiff as

8  a gang member.  In this regard, the classification committee made the following comments:

9          Inmate Lopez appeared before Facility C UCC this date for his
           program review.  Committee notes:  inmate Lopez was refered [sic]
10         to the CSR and on 11/2/99 thiscase [sic] was defered [sic]
           requesting review by the IGI.  Committee also notes CDC 128 B
11         dated 11/8/99 from the Investigative Services Unit stating that there
           is not enough information to validate Inmate Lopez.  Committee
12         acts to refer to CSR recommending transfer to DVI III or SOL III
           due to classification score and his request.

13

14  (Pl.'s Decl., Ex. 35.)

15          The court has examined the documents submitted by defendants under seal on

16  October 12, 2007 (Doc. No. 161).  Having done so, the court finds based on those documents that

17  the minimal "some evidence" standard was met with respect to plaintiff's validation as a gang

18  member.  Plaintiff's substantive due process rights were not violated by the validation.  Therefore,

19  defendants are therefore entitled to summary judgment in their favor on this aspect of plaintiff's

20  due process claim.

21          2.  Procedural requirements

22          Above, in Section VI (A), the court has addressed plaintiff's procedural due

23  process claim with respect to his initial placement in administrative segregation.  The legal

24  standards and discussion set forth above will not be repeated here.

25          Suffice it to say, there is currently no evidence before the court that plaintiff  was

26  allowed the opportunity to meaningfully contest the evidence against him during the lengthy

1   period between his placement in administrative segregation on February 2, 2000 and November

2   28, 2001, when he was given the forms describing the confidential information relied upon to

3   validate him.  Rather, at each appearance before the classification committee during that time

4   plaintiff was limited to making a general denial of gang affiliation and inquiring how long it

5   would take prison officials to decide whether they would validate him or not.  (Pl.' Decl., Ex. 46)

6   (Exs. A-H to Defendant Cook's Response to Pl.'s First Req. for Admissions, Ex. I).  For the

7   reasons set forth above, this lengthy delay after his commitment to administrative segregation

8   without a meaningful opportunity to refute the gang validation evidence, unaddressed by

9   defendants in their pending motion, does not appear to comport with the due process requirements

10  set forth above.

11          At the very least, defendants have failed to establish that they are entitled to

12  summary judgment in their favor on this aspect of plaintiff's due process claim.  Accordingly, the

13  court will recommend that the pending motion be denied in this respect.

14  VII.  Sixteenth, Seventeenth and Eighteenth Causes of Action - State Law Claims

15          Plaintiff's sixteenth, seventeenth and eighteenth causes of action allege claims

16  based on provisions of the California Constitution and California Penal Code.  (Third Am. Compl.

17  at 17.)  Plaintiff seeks to invoke this court's supplemental jurisdiction over these causes of action

18  pursuant to 28 U.S.C. § 1367(a).

19          Defendants move for summary judgment in their favor with respect to these state

20  law claims on numerous grounds.  The court is persuaded by the argument that the claims name

21  only the State of California as a defendant.  (See Third Am. Compl. at 17.)  The State of

22  California is not a proper defendant in this action and the court has not authorized service of the

23  third amended complaint upon the State.  Plaintiff has not effectively addressed this deficiency.

24          Accordingly, the court will recommend that defendants' motion for summary

25  judgment in their favor as to plaintiff's state law claims be granted.

26  /////

46

VIII.  Twentieth Cause of Action - Conspiracy

          In this cause of action plaintiff alleges that the defendants conspired to deprive him

of his constitutional rights.  (Third Am. Compl. at 18.)

          Defendants move for summary judgment arguing that although plaintiff had

multiple encounters with the defendants over the years, he has not presented any evidence that

there was an agreement among the defendants to violate his rights.  (Defs.' P. & A. at 14.)  In

addition, all defendants have filed declarations in which they deny participation in any conspiracy

to violate plaintiff's rights.[24]

          In opposition, plaintiff erroneously argues that defendant Vanderville has not

denied his involvement in a conspiracy.  (Opp'n at 39.)  Therefore, plaintiff asks that counsel be

appointed and that discovery be reopened to allow him to depose witnesses.  (Id.)  Plaintiff also

asserts that the defendants' declarations denying the existence of a conspiracy are self-serving.

Plaintiff argues that defendants acted in concert in the following ways:

> [T]hey sat in I.C.C. together confirming the false allegation that 11
> points existed to validate me, and they jointly participated in the
> false disciplinary related actions, they fabricated evidence to
> validate me, and approved those false claims and fabricated items,
> etc.  They approved ad-seg retention extension without any real
> underlying evidence.  They unlawfully placed me on a contraband
> survellaince [sic] watch, then issued and approved false documents.
> They breached my confidential legal product, misrepresented
> portions of it as a gang link, then approved the same.  They
> submitted, and approved, a validation package - - of fabricated and
> unreliable items - - without providing due process protections of
> notice of the items and opportunity to present my views prior to
> submitting the packet.  They denied me evidence, and made such
> disappears [sic], needed to prove my innocence.  And they routinely

/////

---

[24]  In the pending motion defense counsel suggests that defendant Vanderville is the lone
defendant who has not filed such a declaration.  Counsel, and plaintiff, are mistaken in this
regard.  Defendant Vanderville has filed a declaration denying that he conspired with any
correctional officials to violate plaintiff's rights and also stating that none of his actions were
taken for purposes of retaliating against plaintiff.  (Doc. No. 157, Part 10 at 5-6) (Vanderville
Decl. in Support of Mot. for Summ. J., ¶ 4 at 2).

1    threatened inmates in order to produce false, confidential,
     information - - including specifically against me.
2

3    (Opp'n at 39-40.)

4           In order to prevail on a conspiracy claim under § 1983, a plaintiff must allege and

5    prove some deprivation of a constitutional right which resulted from the alleged conspiracy.  See

6    Woodrum v. Woodward County, Okla., 866 F.2d 1121, 1126 (9th Cir. 1989).  "A conspiracy

7    occurs only when the parties have reached 'a unity of purpose or a common design and

8    understanding, or a meeting of minds in an unlawful arrangement.'"  William Inglis & Sons

9    Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1055 (9th Cir. 1981) (quoting

10   American Tobacco Co. v. United States, 328 U.S. 781, 809-10 (1946)).  Thus, a plaintiff must

11   show that there was an agreement by the defendants to violate his constitutional rights.  See

12   Woodrum, 866 at 1126; Fonda v. Gray, 707 F.2d 435, 438 (9th Cir. 1983).  While it is not

13   necessary to prove that each participant in a conspiracy know the exact parameters of the plan,

14   they must at least share the general conspiratorial objective.  See Fonda, 707 F.2d at 438; see also

15   Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998).  Vague and conclusory allegations with no

16   supporting factual averments or evidence will not withstand an adequately supported motion for

17   summary judgment.  Woodrum, 866 F.2d at 1126; Fonda, 707 F.2d at 438.  Rather, in order to

18   survive summary judgment on a conspiracy claim, plaintiff must provide evidence of specific

19   facts showing that a conspiracy existed.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

20          Here, plaintiff has provided only vague and conclusory allegations that defendants

21   agreed together to violate his rights.  Such bare allegations are not sufficient to avoid summary

22   /////

23   /////

24   /////

25   /////

26   /////

1 judgment in light of the declarations filed by defendants.[25]  Therefore defendants are entitled to

2 summary judgment in their favor with respect to plaintiff's conspiracy claim.

3                                                    **CONCLUSION**

4            In accordance with the above, IT IS HEREBY RECOMMENDED that defendants

5 October 11, 2007 motion for summary judgment (Doc. No. 157) be granted in part and denied in

6 part as follows.

7            1.  Defendants' motion for summary judgment be granted with respect to:

8            a.  Plaintiff's claim that his placement and retention in administrative

9 segregation was retaliatory as to defendants Adams, Babich, Bartos, Gilliam, Harrison, Holmes,

10 Johnson, McClure, McKean, Martinez, Morton, Nergenah, Shaver, Statti and Vanderville;

11            b. Plaintiff's claim that the defendants acted in a retaliatory fashion when

12 they participated in his validation as a gang member;

13            c.  Plaintiff's claim that defendants acted in a retaliatory fashion in issuing

14 three rules violation reports;

15            d.  Plaintiff's claims in his first and seventh causes of action that defendants

16 acted in a retaliatory fashion in several other instances listed in those claims;

17            e.  Plaintiff's fifth and sixth causes of action;

18            f.  Plaintiff's twelfth, fourteenth, sixteenth, seventeenth, eighteenth,

19 nineteenth and twentieth causes of action; and

20            g.  The substantive due process aspect of plaintiff's fifteenth cause of action

21 attacking the sufficiency of the evidence relied upon for his gang validation.

22

23            [25]  Plaintiff also alleges a conspiracy claim under 42 U.S.C. § 1985.  In order to proceed
   under § 1985, a plaintiff must "show . . . that 'some racial, or perhaps otherwise class-based,
24 invidiously discriminatory animus [lay] behind the conspirators' action.'"  Bray v. Alexandria
   Women's Health Clinic, 506 U.S. 263, 267-68 (1993) (quoting Griffin v. Breckenridge, 403 U.S.
25 88, 102 (1971)).  Accord Butler v. Elle, 281 F.3d 1014, 1028 (9th Cir. 2002).  Plaintiff has
   presented no evidence establishing the existence of a conspiracy or of some racial or class-based
26 discrimination.

1          2.  Defendants' motion for summary judgment be denied with respect to:

2                a.  Plaintiff's retaliation claim against defendants Garate and Cook with

3  respect to his placement and retention in administrative segregation;

4                b.  Plaintiff's tenth cause of action in which he alleges that defendant

5  Bartos retaliated against him for engaging in protected legal activity by falsely labeling him; and

6                c.  All procedural due process aspects of plaintiff's fifteenth cause of action

7  challenging his initial placement and retention in administrative segregation and his ultimate gang

8  validation.

9          These findings and recommendations are submitted to the United States District

10 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

11 days after being served with these findings and recommendations, any party may file written

12 objections with the court and serve a copy on all parties.  Such a document should be captioned

13 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14 shall be served and filed within ten days after service of the objections.  The parties are advised

15 that failure to file objections within the specified time may waive the right to appeal the District

16 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17 DATED: September 26, 2008.

18

19                                    _____
                                      DALE A. DROZD
20                                    UNITED STATES MAGISTRATE JUDGE

21   DAD:4
     lope1605.msj2
22

23

24

25

26